EUGENE TOMASZEWSKI *et al.*, Plaintiffs-Appellants, v. MUKUND P. GODBOLE, Defendant-Appellee.

Third District   No. 3—87—0712

Opinion filed September 22, 1988.

STOUDER, P.J., dissenting.

Bernard K. Weiler, Donald C. Bevins, and Constance J. Burnett, all of Puckett, Barnett, Larson, Mickey, Wilson & Ochsenschlager (John R. Wienold, of counsel), for appellants.

Carol Freeman, of Lane & Waterman, of Davenport, Iowa, for appellee.

JUSTICE HEIPLE delivered the opinion of the court:

The plaintiffs, Eugene and Shirley Tomaszewski, brought a suit against the defendant, Dr. Mukund Godbole, for medical malpractice. The plaintiffs' theories of recovery at trial were basically that Mr. Tomaszewski did not give his informed consent to the procedure performed or its attendant risks, and that the procedure performed was unnecessary because the standard of care for Mr. Tomaszewski's condition was medical management. Following trial, the jury rendered a verdict in favor of the defendant and against the plaintiffs. The plaintiffs appeal. We affirm.

On appeal, the plaintiffs do not contend that the jury verdict is against the manifest weight of the evidence. Rather, they maintain that they are entitled to a reversal of the judgment and a remand for a new trial because of several errors occurring at trial which substantially prejudiced them. Because the plaintiffs do not contend that the verdict is against the manifest weight of the evidence, we need not give a detailed recital of all the evidence at trial. The relevant evidence for purposes of resolving the plaintiffs' allegations of error is as follows.

Mr. Tomaszewski is 61 years old and has a history of gastric pain and heartburn. In 1958, he was diagnosed as having an ulcer by Dr. Poppens and was placed on a restrictive diet. Sometime between 1961 and 1976, Mr. Tomaszewski began seeing Dr. Brannon, who is since

deceased, for abdominal pain, gastric pain and heartburn. Dr. Brannon prescribed Tagamet for his symptoms. Mr. Tomaszewski testified that he took the Tagamet as needed.

In 1976, Mr. Tomaszewski again visited Dr. Poppens and was diagnosed as having acute gastritis. The doctor prescribed sedatives, tranquilizers and a bland diet. That same year, Mr. Tomaszewski visited Mayo Clinic and was treated by Dr. Higgins. An upper gastrointestinal X ray and an endoscopy revealed reflux esophagitis, or a narrowing of the esophagus, a Schatzki's ring, or stricture in the area of the diaphragm, and a hiatal hernia. The stomach was normal. Dr. Higgins advised him to continue with the Tagamet.

In 1981, Mr. Tomaszewski visited Dr. Konetzki, who had taken over Dr. Brannon's practice. He gave the doctor a history of lower thoracic pain, upper abdominal pain, upper gastric pain and heartburn, symptoms consistent with reflux esophagitis and ulcer. Dr. Konetzki indicated that the reflux esophagitis problem had been going on too long without significant improvement and suggested to Mr. Tomaszewski that he consider surgery. Dr. Konetzki also recommended surgery because he did not believe Mr. Tomaszewski complied with the recommendations for medical management of his problems. Such recommendations included taking Tagamet four times a day with meals and at bedtime, avoiding certain foods, cigarettes, large meals and stress, and elevating the head of the bed. Until such time as Mr. Tomaszewski chose surgery, Dr. Konetzki prescribed Tagamet.

Mr. Tomaszewski first saw the defendant doctor in December of 1981 upon recommendation of his wife's doctor, Dr. Tarsinos. The defendant became familiar with Mr. Tomaszewski's history and scheduled an endoscopy. The endoscopy revealed the same problems revealed by the Mayo Clinic endoscopy—reflux esophagitis, a Schatzki's ring in the area of the diaphragm, and a hiatal hernia. It also revealed a duodenal ulcer. The defendant then spoke to someone from the records department at Mayo Clinic over the telephone. This person apparently read the defendant Mr. Tomaszewski's medical record from Mayo Clinic. Based on his observations and tests and the Mayo Clinic record, it was the defendant's conclusion that medical treatment had failed and that the plaintiff required surgery to correct the problems of reflux esophagitis, hiatal hernia, and ulcer.

The defendant testified that he explained to the plaintiffs his opinion that surgery was necessary to correct Mr. Tomaszewski's problems. He also informed the plaintiffs of the risks of such surgery and the other options available to Mr. Tomaszewski. To correct the ulcer problem, the defendant explained that he would cut the vagus nerves

to decrease the amount of acid being produced in the stomach. If Mr. Tomaszewski's anatomy permitted, he would perform a partial cell vagotomy where branches of the nerve are removed. If not, the entire vagus nerve would be severed in a procedure called a truncal vagotomy. A truncal vagotomy requires an additional procedure called a pyloroplasty, or an opening in the lower stomach to allow the stomach to empty. Risks attendant to a pyloroplasty include diarrhea and "dumping syndrome," or the passage of incompletely digested food immediately after eating. To correct the hiatal hernia and reflux esophagitis, the defendant explained that he would apply a device called an Anglechik antireflux ring. The defendant maintains that Mr. Tomaszewski elected to undergo surgery with the attendant risks.

During Mr. Tomaszewski's surgery, a truncal vagotomy and pyloroplasty were performed. Following surgery, Mr. Tomaszewski experienced chronic diarrhea and dumping syndrome. He and his wife filed suit against the defendant for medical malpractice. The plaintiffs' theories of recovery at trial were basically that Mr. Tomaszewski did not give his informed consent to the procedure performed or its attendant risks and that the procedure performed was unnecessary because the standard of care for Mr. Tomaszewski's condition was medical management. The jury returned a verdict for the defendant.

■ The plaintiffs appeal and urge that several errors occurred at trial warranting a reversal. Where it is not contended that the verdict is against the manifest weight of the evidence, the verdict will not be disturbed for contentions of a nonprejudicial nature. The object of review is not to determine whether the record is completely free of error, but whether any error occurred which operated to the prejudice of appellant or unduly affected the outcome below. *Saputo v. Fatla* (1975), 25 Ill. App. 3d 775.

The plaintiffs first argue that the trial court committed reversible error when it denied their motion for a mistrial based on a remark made by the defendant during his testimony which allegedly violated an order *in limine*. Prior to trial, the court entered an order *in limine* prohibiting all witnesses from referring to statements made by either of the plaintiffs about the incompetence of, or their dissatisfaction with, members of the medical community. Notwithstanding the order, the following took place at trial:

"Q. [Defense Attorney]: What information did you receive on this patient before you first saw him?

A. [Defendant]: That this gentleman had pain, and difficulty in swallowing, and the condition was severe enough that he had needed to be seen soon. That he had been referred to another

surgeon but had stated that the other surgeon was a son-of-a-bitch who had—

MR. WIENHOLD [Plaintiffs' Attorney]: Objection, your Honor. This was specifically covered in motion *in limine* and has done nothing but inflame the jury.

THE COURT: Sustained.

MR. WIENHOLD: Move that it be stricken and witness be admonished.

THE COURT: I would instruct the—first, I would strike the last statement and instruct the jury not to consider the last statement of what he said about the other doctors, what you are referring to Counsel."

■ For the violation of an order *in limine* to be the basis of a new trial, the order must be specific and the violation clear. Where the likelihood of prejudice is great, the violation is reversible error. (*In re Estate of Loesch* (1985), 134 Ill. App. 3d 766.) The plaintiffs maintain that prejudice ensued from the defendant's remark because it destroyed Mr. Tomaszewski's credibility and because the case turned on the credibility of the parties. We disagree.

To prevail on the first issue in the controversy, the lack of informed consent claim, the plaintiffs had to prove that the defendant failed to advise Mr. Tomaszewski of the foreseeable risks and results of a given surgical procedure as well as the reasonable alternatives to such a procedure, that a reasonable medical practitioner of the same school in similar circumstances would have disclosed such risks, results or alternatives, and that the failure to disclose proximately caused Mr. Tomaszewski's injuries. The failure of a physician to conform to the professional standards of disclosure must be proved by expert medical evidence. (*Guebard v. Jabaay* (1983), 117 Ill. App. 3d 1.) Thus, Mr. Tomaszewski's credibility had little, if anything, to do with the issue.

■ Moreover, Mr. Tomaszewski's expressed opinion that a particular surgeon was a son of a bitch says nothing really definitive about either the surgeon's abilities or the holder of the opinion. That is to say, the remark is quite irrelevant to either point. A surgeon can be fully competent in his profession and still be regarded as a son of a bitch by patients and colleagues. That is a matter of common experience. The fact that Mr. Tomaszewski's opinion was expressed to the jury does not adversely reflect on Mr. Tomaszewski's credibility. Further, the court's striking of the remark and instruction to the jury to disregard it was adequate to the situation.

The second issue in the case was whether the defendant commit-

ted malpractice in recommending surgery rather than pursuing a course of medical management. This issue, too, depended on the jury's assessment of expert medical testimony and was not dependent on Mr. Tomaszewski's credibility.

■■ ■ Another of plaintiffs' arguments was whether the court erred in prohibiting the plaintiffs from introducing evidence allegedly tending to show that the defendant doctor was motivated by the existence of health insurance to forego a course of medical management in favor of surgical intervention. Evidence of the existence of health insurance is generally inadmissible, but may be admitted to prove relevant issues raised in a case. (*Nitrin, Inc. v. Bethlehem Steel Corp.* (1976), 35 Ill. App. 3d 577.) As stated above, the issues of medical malpractice depended on the jury's assessment of the testimony of the expert witnesses. The issues did not depend or turn on the defendant's motivation. Thus, evidence that the plaintiffs had health insurance, and that the defendant was allegedly motivated by it, was irrelevant to the issues at trial and was properly kept from the jury.

Further, the plaintiffs' offer of proof on the subject was speculative at best. The offer of proof demonstrated that upon learning Mr. Tomaszewski had health insurance, the defendant told him he could have the endoscopic examination performed at the hospital and be admitted overnight since his insurance would pay for it. Such evidence demonstrates to this court that the defendant was trying to save the plaintiffs out-of-pocket expenses, not that the defendant was improperly motivated. The offer of proof further demonstrated that on the same day the defendant learned of the plaintiffs' health insurance he wrote in his notes that he was going to recommend surgery following the endoscopic procedure. We fail to see how this evidence reveals improper motivation on the part of the defendant. The notes are completely consistent with Mr. Tomaszewski's testimony that the defendant discussed the possibility of surgery with him and recommended it to him during their first consultation.

■■ ■ We next turn to the plaintiffs' argument that the court erred in allowing the incompetent, hearsay testimony of the defendant regarding what he learned about the plaintiff from his telephone conversation with an unidentified person at Mayo Clinic. We disagree that evidence of the telephone conversation was incompetent or constituted hearsay. As regards the competence of the evidence, calls made by a witness to a place of business and relating to the business are admissible assuming regularity and authority in the answering. This is so whether the caller/witness knew the identification of the answering party or not. While the weight to be given to such a conver-

sation is to be determined by the trier of fact, the court did not err in admitting the evidence. *Godair v. Ham National Bank* (1907), 225 Ill. 572.

■■ ■ In regard to the plaintiffs' hearsay objection to the conversation, a definition of hearsay is in order:

"Hearsay evidence is testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." *(People v. Carpenter* (1963), 28 Ill. 2d 116, 121.)

The statement of the unidentified person at Mayo Clinic was not offered by the defendant for the truth of that statement, *i.e.*, the truth of the Mayo Clinic medical records. Rather, it was offered as a basis for the defendant's opinion, as a treating physician, that surgical intervention was a proper course of action in Mr. Tomaszewski's case. Further, the value of the evidence did not rest upon the credibility of the unidentified person at Mayo Clinic; it rested upon the credibility of the defendant and whether or not the jury believed that the defendant had the conversation in the first place. Thus, the testimony did not constitute hearsay and was properly admitted.

■■ The plaintiffs next maintain the court committed reversible error when it allowed the defendant's hearsay testimony that he first agreed to see Mr. Tomaszewski after being told by Dr. Tarsinos, who is since deceased, that Mr. Tomaszewski needed to be seen urgently. The plaintiffs argue that the testimony implied Mr. Tomaszewski's condition required emergency intervention, when they were attempting to establish that it did not. Even assuming that error occurred in allowing the testimony, it was harmless. As the plaintiffs state in their brief, it was established at trial that Mr. Tomaszewski's condition did not present an emergency situation. The defendant as well as three other doctors testified that neither the esophageal or ulcer problem required emergency intervention. This testimony more than outweighed any alleged error in the defendant's statement.

We next turn to the plaintiffs' argument that they were improperly prevented from introducing testimony that Mr. Tomaszewski was only taking Tagamet on an "as needed" basis, rather than as the experts testified was necessary for medical management of ulcer disease, pursuant to Dr. Brannon's instructions. During one point in the trial, the trial court precluded the testimony as hearsay upon the defendant's objection. The trial court also struck a portion of Dr. Konetzki's deposition testimony wherein the doctor testified that Mr. Tomaszewski related to him that he took Tagamet on an as needed ba-

sis pursuant to Dr. Brannon's orders.

██ Assuming *arguendo* that the testimony was improperly kept from the jury, any error is harmless. It is recognized that a party cannot complain of exclusion of evidence where the same evidence is subsequently admitted. (*Saputo v. Fatla* (1975), 25 Ill. App. 3d 775.) Here, the following colloquy took place between Mr. Tomaszewski and his attorney at trial:

"Q. Did you tell [the defendant] with what frequency you were taking the Tagamet prior to your seeing him?

A. Yes. I believe I did.

Q. What did you tell him in that regard?

A. Pardon?

Q. What did you tell him?

A. I told him that—*the prescription and advice of the other doctors that I had seen, which was Brannon that gave me the prescription for the Tagamet, that it was when I was really, you know, overworked, and stuff like this, you know, and had the heartburn and stuff, then in the discomfort, then I would take this.*

Q. And how often would you take it?

A. Well, it might—it related to the output, you know. If you was—if I worked long hours or something and I did have the heartburn and the discomfort then I would go on a regimented diet or something of this, of like I would take it in the morning and the evening, in the morning and the evening, and then it would go away.

Q. How long would that be? How long would you take it in the morning and the evening?

A. A few days." (Emphasis added.)

Additionally, the following testimony took place at trial between Mr. Tomaszewski and his attorney:

"Q. Gene, after you saw Dr. Brannon, how did you take the Tagamet over the next few years?

A. Dr. Brannon prescribed—

MRS. FREEMAN [Defense Attorney]: Excuse me, your Honor. I object to any hearsay. That's voluntary on the part of the witness.

THE COURT: Overruled. I'll let him answer the question.

Q. [Plaintiffs' Attorney]: Go on, Gene.

A. Can I—

THE COURT: Go ahead and answer the question.

A. He prescribed the Tagamet because it was the newest

thing above—is it all right if I saw [*sic*] what he told me.

THE COURT: No. You can say what you did.

* * *

A. Okay. Okay. I'm sorry. In other words, I took the Tagamet in the morning and at night when I—

Q. Okay. Go ahead.

A. When I had discomfort and heartburn and when I—the heartburn was relieved and everything after, as previously, as I said previously.

Q. Two to three days is that what you are talking about?

A. Whatever time it took and the time that maybe a weekend would come up and I would rest on a Sunday or stuff. All these things would subside and I don't know how to explain it. Then I didn't take it anymore because that's—

THE COURT: Ask your next question.

A. I don't know what to say.

Q. All right. And you say then it would subside and you wouldn't take it anymore, is that—

A. Well, I can't say. *That's what I was—*

Q. No, you can.

A. *—I was told to do.*" (Emphasis added.)

We believe the admission of the above-quoted evidence renders harmless the plaintiffs' complaint of error on appeal.

■■■ Next, the plaintiffs contend the trial court erred in striking the answer of Dr. Higgins to a hypothetical question that it is reasonable to initiate a second course of Tagamet therapy for ulcer symptoms which recur following a successful first course of Tagamet therapy for ulcer symptoms. We disagree. There must be an evidentiary basis for each element included in a hypothetical question. (*Gus T. Handge & Son Painting Co. v. Industrial Comm'n* (1965), 33 Ill. 2d 201.) Here, there was no evidence that Mr. Tomaszewski had ever been successfully treated with Tagamet therapy in the past or that the Tagamet therapy he had been undergoing was a second course of such therapy. Thus, there was no evidentiary basis for the hypothetical question and answer, and it was properly stricken.

■■■ The plaintiffs next contend that the trial court erred in unduly restricting them from arguing a theory of their case. This argument is meritless. In closing rebuttal, the plaintiffs' attorney made the argument that the defendant altered a date on certain progress notes to show that he informed the plaintiffs of the nature of the operative procedure as well as its risks prior to performing it, when in fact, the notes were prepared after the operation when the defendant

learned that Mr. Tomaszewski had not agreed to a truncal vagotomy and pyloroplasty. The defendant objected to the argument, and the court ordered the plaintiffs' attorney to rephrase the argument. The plaintiffs' attorney continued with the closing and made his argument, without objection, that a date on the notes had been changed, and that the defendant's notes were prepared after surgery, rather than before surgery. Thus, the plaintiffs were not unduly restricted in arguing a theory essential to their case.

▆▆ The plaintiffs' final argument is that the cumulative effect of the alleged errors warrants a reversal of the case. We disagree. We have carefully examined the record in this regard and hold that any errors committed, individually or collectively, do not require a new trial. Accordingly, the judgment of the circuit court of Bureau County is affirmed.

Affirmed.

SCOTT, J., concurs.

PRESIDING JUSTICE STOUDER, dissenting:

I disagree with the result set forth in the majority opinion. My disagreement is with the majority's finding that Dr. Godbole's hearsay testimony is competent. In its opinion, the majority finds that the alleged conversation the defendant purported to have with a person from the Mayo Clinic to have been properly admitted by the trial court.

With regard to the competency of the testimony of Dr. Godbole, the majority finds the testimony to be competent based upon the principle that calls made by a witness to a place of business relating to that business are admissible assuming regularity and authority in answering. (*Godair v. Ham National Bank* (1907), 225 Ill. 572, 80 N.E. 407.) This principle applies whether the caller/witness knew the identification of the answering party or not. *Godair v. Ham National Bank* (1907), 225 Ill. 572, 80 N.E. 407.

While I do not find fault with the above-stated provisions, they are not applicable in this instance. After a search of authority, I have been unable to locate any cases where the above provisions have been applied in a similar instance as the present case. The rule is applied only to those cases when one party to the litigation places a business telephone call to the establishment of the other party to the litigation by means of a number listed for business purposes. (See, *e.g., Godair v. Ham National Bank* (1907), 225 Ill. 572, 80 N.E. 407; *Rogers*

*Grain Co. v. Tanton* (1907), 136 Ill. App. 533; *Trapp v. Rockford Electric Co.* (1914), 186 Ill. App. 379; *Delaney v. McNeil & Higgins Co.* (1915), 195 Ill. App. 524; *Korch v. Indemnity Insurance Co. of North America* (1946), 329 Ill. App. 96, 67 N.E.2d 298; *Holland v. O'Shea* (1950), 342 Ill. App. 127, 95 N.E.2d 517; *Gothberg v. Nemerovski* (1965), 58 Ill. App. 2d 372, 208 N.E.2d 12; *Devers v. Prudential Property & Casualty Insurance Co.* (1980), 86 Ill. App. 3d 542, 408 N.E.2d 462; *Smith v. Seiber* (1984), 127 Ill. App. 3d 950, 469 N.E.2d 231; see also 71 A.L.R. 5 (1931); 105 A.L.R. 326 (1936); 18 Ill. L. & Prac. *Evidence* §45, at 184 (1956).) In the instant case the defendant is seeking to introduce his self-serving testimony of a telephone call he made to a third person who is not identified, and who is not involved in this action, against the plaintiff, who has no way of proving or disproving the defendant's contention.

The doctor defendant's hearsay testimony at trial included both the fact that he actually made the call to the clinic and information he had allegedly learned from the conversation. The Illinois Supreme Court, in *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, adopted Rules 703 and 705 of the Federal Rules of Evidence (Fed. Rules Evid. 703, 705). Federal Rule 703 has been interpreted to allow opinions based upon facts not in evidence. (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 193, 417 N.E.2d 1322, 1326). Under Federal Rule 705 an expert may give an opinion without disclosing the facts underlying that opinion. *Wilson v. Clark* (1981), 84 Ill. 2d 186, 194, 417 N.E.2d 1322, 1326.

The key element in applying Rules 703 and 705 is the assurance that the information upon which a testifying expert bases his opinion is of a type that is reliable. (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 193, 417 N.E.2d 1322, 1326.) In the instant case, the information obtained by the doctor cannot be considered reliable. The defendant's account of his telephone conversation is contrary to ordinary medical practices concerning confidentiality. Ordinarily, a clinic would not release confidential medical records concerning one of its patients to a telephone caller. The defendant does not argue, and the majority does not suggest, that the release of confidential medical records to a telephone caller is an established medical practice. Further, the defendant has not produced any Mayo Clinic log or notation indicating that a call or request was made to them to release the plaintiff's records. The defendant cannot identify what day he called, what time he called, or whom he spoke to. In addition, the doctor's testimony is by its nature self-serving, without any of the underlying foundational requirements which permit the introduction of hearsay testimony under

the rules enunciated in *People v. Ward* (1975), 61 Ill. 2d 559, 388 N.E.2d 171, and *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322. Thus, the trial court failed to exclude the doctor's testimony concerning the call he purportedly made to the Mayo Clinic.

Finally, since the area of the testimony covered related to a critical issue in this case, the error was so prejudicial that a new trial is in order.